# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONA T. DEFELICE,         )
        Plaintiff,       )        Civil Action No. 06-1181
                    )
      v.             )
                    )
PENNSYLVANIA STATE POLICE, )
COMMONWEALTH OF        )
PENNSYLVANIA, JEFFERY B.   )
MILLER, JOHN BROWN, ROBERT )
TITLER, DALE BLASKO,      )
        Defendants.    )

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before this court is a motion for summary judgment (Docket No. 62) filed by the Pennsylvania State Police ("PSP"), Jeffery B. Miller ("Miller"), John Brown ("Brown"), Robert Titler ("Titler"), and Dale Blasko ("Blasko") (together "defendants" and Miller, Brown, Titler and Blasko, "individual defendants"). Dona T. DeFelice ("DeFelice" or "plaintiff"), a former PSP officer, asserts gender-based hostile work environment claims against her former employer the PSP and equal protection claims against her former superiors Miller, Brown, Titler, and Blasko. Plaintiff's claims arose from the conduct of Joseph N. Lapia ("Lapia"), her former superior at the PSP.

Plaintiff asserts claims: (1) against the PSP for gender-based hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") pursuant to 42 U.S.C. §§ 2000e, *et seq.*, and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951, *et seq.* ("PHRA"); and (2) against the individual defendants under 42 U.S.C. § 1983 ("§ 1983") for violations of plaintiff's right to equal protection under the Fourteenth Amendment. Defendants

move for summary judgment on all claims.  After considering the submissions of the parties, including the joint statement of material facts (Docket No. 74) ("J.S."), the court will grant defendants' motion for summary judgment because plaintiff's claims are time-barred.

### *Factual Background*

**A.  General**

The PSP is an agency of the Commonwealth of Pennsylvania providing law enforcement services to its citizens.  (J.S. ¶ 1.)  The PSP divided the Commonwealth into areas and assigned divisions or "troops" to patrol each area.  (J.S. ¶ 4.)  Southwestern Pennsylvania was designated as Area III and patrolled by Troop A.  (Defs.' App. (Docket No. 64), Ex. 34 at 6-7.)  "Troop A itself comprises four counties in southwest Pennsylvania with Troop A Greensburg being the headquarters . . . ."  (J.S. ¶ 4.)  "The substations were Kiski Valley in Westmoreland County, Ebensburg in Cambria County, Somerset in Somerset County, and Indiana in Indiana County."  (Id.)

In 2002, discipline matters in the PSP were the responsibility of the Deputy Commissioner of Administration.  (J.S. ¶ 2.)  The Deputy Commissioner of Administration had oversight of the Department Discipline Officer ("DDO") and the Bureau of Professional Responsibility ("BPR"), which included the Internal Affairs Division ("IAD").  (Id.)  In 2004, the PSP made a number of administrative changes, including the creation of a new position, the Deputy Commissioner of Professional Responsibility.  (J.S. ¶ 3.)  The Deputy Commissioner of Professional Responsibility was given oversight of the DDO, the BPR, and the IAD.  (Id.)  During the administrative changes the BPR was renamed the Bureau of Integrity and Professional Standards ("BIPS").  (Id.)

**B. Hostile work environment**

DeFelice is an adult female who began employment with the PSP in January 1983. (J.S. ¶ 23.) In 2002, DeFelice was assigned to the crime section in Troop A Greensburg's headquarters. (J.S. ¶ 25.) On or about July 6, 2002, Lapia became DeFelice's supervisor when he was named the crime section supervisor for Troop A Greensburg's headquarters. (Id.) DeFelice recalled one incident between Lapia and her shortly before Lapia became her supervisor. (J.S. ¶ 45.) During the incident Lapia kissed DeFelice on the mouth after she delivered mail to his office. (Id.) The kiss was not officially reported, but DeFelice told a female co-worker about the incident. (Id.) After the initial kiss, Lapia told DeFelice he would "french kiss" her before he became "her boss." (J.S. ¶ 46.) Lapia began to countdown the days until he became DeFelice's boss. (Id.) For example, Lapia said to DeFelice, "only ten more days." (Defs.' App., Ex. 30 at 35.) DeFelice did not formally report the incidents, but she did discuss them with co-workers. (J.S. ¶ 46.)

After Lapia became DeFelice's supervisor, DeFelice recalled "[half] a dozen times from July 6 to October 9[, 2002] where Lapia physically touched her in an offensive manner . . . ." (J.S. ¶ 47.) The incidents included Lapia putting his arm around DeFelice's waist and simulating biting her breast, grabbing her rear end, and putting his hands on her shoulders. (Id.) On August 30, 2002, Lapia made a comment to DeFelice that she interpreted to be about oral sex. (J.S. ¶ 48.) On September 6, 2002, after an exchange between Lapia and DeFelice over her work schedule, DeFelice confided in Sergeant Rock ("Rock"), DeFelice's co-worker, about her problems with Lapia. (Id.) She asked Rock not to speak to others about the matter. (Id.) In October 2002, Lapia came into DeFelice's office and "'took his right hand and . . . rubbed it on

the inside of [her] left thigh.'" (J.S. ¶ 49.) DeFelice did not notify Rock about this incident.

Rock, however, told the section commander Lieutenant Weaver ("Weaver") about Lapia's

conduct. (J.S. ¶ 50.)

On October 9, 2002, Rock reported Lapia's behavior to Weaver. (J.S. ¶ 50.) DeFelice

was called to Weaver's office and reported Lapia's conduct. (Id.) Weaver went to Troop

Commander Captain Frank Monaco ("Monaco"); when Weaver returned he asked DeFelice

"what [she] wanted done." (Id.) DeFelice replied, "it didn't matter to her." (Id.) When she was

told Lapia could be removed or placed in another station DeFelice said she "d[id]n't care . . .

because [she was] going on five days off." (Id.)

DeFelice returned to work on October 15, 2002, and was told to go home at noon. (J.S. ¶

51.) That same day, Lapia was reassigned to the Indiana station in Troop A. (Id.) Lapia was

placed on restricted duty status when he was reassigned to the Indiana station. (J.S. ¶ 34.) After

Lapia's reassignment, DeFelice never spoke to or was under the supervision of Lapia. (Id.)

From Lapia's assignment at the Indiana station until his retirement in April 2004, DeFelice had

to reschedule three training sessions to avoid being in classes with Lapia. (J.S. ¶ 52.) The

sessions were a stress shooting training session on September 26, 2003, a shift planning session

in October 2003, and a legal update session in November 2003. (Defs.' App., Ex. 30 at 106-09;

Pl.'s Second Am. Compl. (Docket No. 55) ¶ 30.) The rescheduling was "an inconvenience" to

DeFelice. (J.S. ¶ 52.)

After his transfer, Lapia was given assignments by his station commanders which

required him to visit the Greensburg headquarters. (J.S. ¶ 35.) Lapia would travel to the

Greensburg headquarters to "pick up tires for the station, [or] drop off blood at the lab", "pick up

supplies . . . [and] drop off reports or pick up reports." (Id.) On several occasions, DeFelice was

notified that Lapia was at the Greensburg headquarters.  (J.S. ¶ 52.)  On one occasion, DeFelice

took action to avoid Lapia when she saw Lapia on the other side of a PSP parking lot.  (Defs.'

App., Ex. 30 at 105.)  DeFelice left the area, entered the barracks, went into her office, and shut

the door.  (Id.)  Lapia did not see DeFelice on this occasion.  (Defs.' App., Ex. 31 at 60.)

Between October 16, 2002 and April 27, 2004, DeFelice never spoke with Lapia or passed him

in a hall.  (Defs.' App., Ex. 30 at 104.)  Following his transfer, Lapia never attempted to contact

DeFelice, and did not recall ever seeing or encountering DeFelice.  (J.S. ¶ 39.)  DeFelice never

reported that she was having problems with Lapia's presence at the Greensburg headquarters,

and did not request that steps be taken to avoid encounters with Lapia after his reassignment to

the Indiana station.  (J.S. ¶ 53.)

After seeing Lapia at the Greensburg headquarters, Blasko received assurances that

Lapia's visits would be brief, and that "[Lapia] would in no way, no way attempt to approach or

encounter or meet with or deal with Dona DeFelice."  (J.S. ¶ 38.)  Lapia stated that he was never

prohibited from returning to the Greensburg headquarters, but that Weaver instructed he "wasn't

supposed to have any contact with Ms. DeFelice."  (J.S. ¶ 37.)  After witnessing Lapia at the

Greensburg headquarters on other occasions, Blasko told the station commander at the Indiana

station that "any time Lapia was going to be at Greensburg for any more than a momentary, brief

pick-up or drop-off of supplies [he] was to be contacted and [he] would take the appropriate

remedies to insure[sic] that DeFelice did not meet up with Lapia."  (J.S. ¶ 39.)

### C.  The Internal Affairs investigation

After speaking to Monaco on October 9, 2002, Weaver issued a formal complaint against

Lapia by completing a PSP form SP1-101, Use of Force or Complaint Reception and Processing

Worksheet.  (J.S. ¶ 56.; Defs.' App., Ex. 17 at 1-2.)  Weaver contacted the PSP's Equal

Employment Office on October 15, 2002, and reported the complaints. (Id.) The complaint was sent to the PSP's IAD section, given BPR control number 2002-0696, and processed for a criminal investigation. (J.S. ¶ 57.) The investigation was assigned to Corporal Calvin Andrews ("Andrews"), who interviewed DeFelice on October 23, 2002. (J.S. ¶¶ 57, 59.) Andrews interviewed other individuals with knowledge about the events concerning Lapia and DeFelice. (J.S. ¶ 60.) During the course of the investigation Andrews became aware of additional allegations against Lapia involving Police Communications Operator ("PCO") Marilyn Sinsabaugh and PCO Angela M. Sykes. (J.S. ¶ 61.)

Andrews investigated the additional allegations, and on June 17, 2003, emailed Lapia asking "'if he wanted to have the opportunity to respond to the allegations made against him in a Miranda interview before the investigation was submitted to Westmoreland County District Attorney John W. Peck [("Peck")] for a written prosecutorial decision.'" (J.S. ¶¶ 61-62.) Lapia declined the Miranda interview, and Andrews submitted a Request for Prosecution Decision to Peck on July 8, 2003. (J.S. ¶¶ 62-63.) On December 4, 2003, Peck issued a prosecution decision. (J.S. ¶ 63.) Following some confusion between Andrews and Peck, Peck was asked to resubmit his decision and a clarifying letter that stated whether criminal charges would be filed against Lapia. (J.S. ¶ 64.) Peck issued his clarification letter on December 17, 2003, stating he was declining prosecution of Lapia on the belief that "prosecution would not result in a successful result for the Commonwealth." (J.S. ¶ 65.)

The PSP continued its investigation to determine whether administrative sanctions should be imposed on Lapia. (J.S. ¶ 66.) On January 24, 2004, Andrews interviewed Lapia concerning the investigation. (Id.) Andrews completed and submitted Report IAD 2002-0696 on February 10, 2004. (J.S. ¶ 67.) The report was forwarded to Blasko for further action. (J.S. ¶ 68.)

Pursuant to PSP regulations, Lapia was offered to partake in a predisciplinary conference with Blasko. (J.S. ¶ 69.) Lapia declined to participate in a conference. (Id.) Blasko reviewed the investigation and "determined that Lapia was, in fact, guilty of the offenses alleged." (J.S. ¶ 70.) On February 25, 2004, Blasko sustained the charges and issued a disciplinary action report, DAR 2004-31. (Id.) On March 1, 2004, Lapia signed a receipt of notice of DAR 2004-31. (J.S. ¶ 71.) On March 5, 2004, Blasko prepared a supplemental report and forwarded the matter to the BPR. (Id.) The matter was assigned to Titler for determination and recommendation of penalty. (Id.)

On March 30, 2004, Titler completed his review of DAR 2004-31 and concluded that Lapia's conduct was in violation of several PSP field regulations. (J.S. ¶ 72.) The regulations included: Regulation 1.02, Unbecoming Conduct; Regulation 1.03, Conformance to Laws; Regulation 1.28, Internal Investigation; Regulation 1.35, Discrimination or Harassment; Regulation 2.05, Competency; and Regulation 2.30, Test Entry. (Id.) Titler recommended a court-martial sanction based upon the regulatory violations. (Id.) Brown, the Deputy Commissioner of Professional Responsibility, concurred with the recommendation. (J.S. ¶ 73.) On April 9, 2004, Lapia received the court-martial notice and was advised of his ability to challenge the decision through court-martial proceedings or through the grievance process. (J.S. ¶ 75.) On April 19, 2004, Lapia acknowledged receipt of the decision. (Id.) On April 27, 2004, Lapia submitted a notice of retirement, indicating his retirement from the PSP. (J.S. ¶ 76.)

**D.  Individual defendants named in plaintiff's § 1983 claim**

**a.  Jeffrey B. Miller**

Miller is the former commissioner of the PSP. Miller was named acting commissioner in January 2003 and was confirmed by the Senate as the PSP commissioner on March 24, 2003. (Defs.' App., Ex. 37 at 6-10.) Miller was not the commissioner when the investigation into

DeFelice's allegations against Lapia began, and Miller had little knowledge of the investigation and disciplinary process. (Defs.' App., Ex. 37 at 13-14, 16-17.)

### b. John Brown

Brown was the director of the IAD in October 2002 when DeFelice filed her internal complaint against Lapia. (Defs.' App., Ex. 36 at 7-9.) Brown was the director of the IAD until his promotion to director of the BPR in April 2003. (J.S. ¶ 15.) After his promotion, Brown maintained his oversight responsibilities of the IAD as director of the BPR. (Defs.' App., Ex. 36 at 23.) In March 2004, Brown was promoted to Lieutenant Colonel and appointed Deputy Commissioner of Professional Responsibility. (Defs.' App., Ex. 36 at 5-7.)

### c. Robert Titler

Titler was the director of the DDO in October 2002 when DeFelice filed her internal complaint against Lapia. (Defs.' App., Ex. 35 at 7-9.) After a DAR was issued, Titler was responsible for making a disciplinary recommendation to the commissioner (or the commissioner's designee) for a suspension of more than thirty days (which is considered a court-martial offense). (Defs.' App., Ex. 35 at 9, 39-40.) Titler could be consulted by commanding officers on restricted duty status or suspension until investigations were completed, but could not implement the penalty himself. (Defs.' App., Ex. 35 at 11-14.)

### d. Dale Blasko

Blasko was the patrol section commander of Troop A Greensburg in October 2002. (Defs.' App., Ex. 34 at 7.) After Lapia's reassignment to the patrol section at the Indiana station on October 15, 2002, Blasko had minor indirect supervision over Lapia. (Defs.' App., Ex. 34 at 8-11.) Blasko was not involved in Lapia's reassignment or determining the parameters of Lapia's restricted duty status. (Defs.' App., Ex. 34 at 12.) On March 3, 2003, Blasko was

assigned as the acting troop commander of Troop A Greensburg. (Defs.' App., Ex. 34 at 15; Ex.

31 at 50.) While serving as acting troop commander, Blasko supervised Lapia and participated

in disciplinary decisions involving members of Troop A. (Defs.' App., Ex. 34 at 15.) On

August 22, 2008, Blasko retired from the PSP. (Defs.' App., Ex. 34 at 5.)

### E. Procedural history

On September 23, 2004, plaintiff filed a complaint with the Pennsylvania Human

Relations Commission ("PHRC") and dual-filed with the Equal Employment Opportunity

Commission ("EEOC"). (Defs.' Mot. to Dismiss Second Am. Compl. (Docket No. 56), Ex. A.)

On September 5, 2006, plaintiff, having exhausted her administrative remedies as to the PSP,

filed her complaint against the PSP in this court. The complaint was amended twice to include

the PSP as a defendant with respect to the Title VII and PHRA claims, and the individual

defendants with respect to plaintiff's § 1983 claims.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted

if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

569(c). A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is

genuine, the court's function is not to weigh the evidence or to determine the truth of the matter,

but only to determine whether the evidence of record is such that a reasonable jury could return a

verdict for the nonmoving party.  Id. at 249.  The court is to draw all reasonable inferences in

favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir.

2007) ("In considering the evidence, the court should draw all reasonable inferences against the

moving party.") The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept
> a moving party's necessary propositions of fact, pre-trial judgment
> cannot be granted. Specious objections will not, of course, defeat a
> motion for summary judgment, but real questions about credibility,
> gaps in evidence, and doubts as to the sufficiency of the movant's
> proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in

deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.

1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd 248 F.2d 543 (3d Cir.

1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits

and other papers that have been identified by affidavit or otherwise made admissible in

evidence").


### Discussion[1]

### A.  Count I - Title VII and PHRA claims for gender-based hostile work environment

Plaintiff alleges the PSP violated her rights under Title VII and the PHRA by creating a

gender-based hostile work environment.[2]  Title VII makes it unlawful for an employer "to

discriminate against any individual with respect to his [or her] compensation, terms, conditions,

---

[1]Defendants assert several bases for their argument that summary judgment should be granted.  The court will discuss only the argument that plaintiff's claims are time-barred.  Because that argument is dispositive, the court will not address defendants' other arguments.

[2]The analysis required for adjudicating plaintiff's claim under the PHRA is identical to a Title VII inquiry. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006); Goosby v. Johnson & Johnson Med., 228 F.3d 313 (3d Cir. 2000).

or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  For claims of sexual harassment, Title VII's antidiscrimination provision prohibits only those forms of discriminatory harassment that are severe or pervasive enough to create a hostile or abusive working environment.  Pa. State Police v. Suders, 542 U.S. 129, 146-47 (2004); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 755 (1998) (holding as a preliminary matter that the supervisor's conduct, which included, among other things, comments about the plaintiff's breasts and legs, stating that wearing shorter skirts would make her job easier, and rubbing her knee was severe and pervasive and the plaintiff's claim "should be categorized as a hostile work environment claim").  The inquiry concerning whether an employee's working environment is sufficiently hostile or abusive to constitute a violation of Title VII encompasses both objective and subjective components.  In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris, 510 U.S. at 21-22.  This test, which is not "mathematically precise," accounts for all relevant factors.  Id. at 22.  Such factors include, but are not limited to, whether the alleged discriminatory harassment is frequent, whether it is severe, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance.  Id. at 23.

"[A] plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment."  Kunin v. Sears Roebuck and Co., 175 F.3d 289,

293 (3d Cir. 1999). Pennsylvania courts have held that hostile work environment claims are cognizable under the PHRA. Phila. Hous. Auth. v. Am. Fed'n of State, County & Mun. Employees, 956 A.2d 477, 484 (Pa. Commw. Ct. 2008); Raya & Haig Hair Salon v. Pa. Human Relations Comm'n, 915 A.2d 728, 732-33 (Pa. Commw. Ct. 2007); Infinity Broad. Corp. v. Pa. Human Relations Comm'n, 893 A.2d 151, 157-59 (Pa. Commw. Ct. 2006). Title VII does not countenance a "cause of action for mere unpleasantness" in the workplace. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997). The Supreme Court has cautioned that "'simple teasing', offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). The Court in Faragher went on to explain that the "standards for judging hostility are sufficiently demanding to ensure Title VII does not become a 'general civility code.'" Id.

### a. Statute of limitations

Plaintiff asserts the PSP created a hostile work environment by condoning Lapia's behavior, delaying the investigation of sexual harassment, failing to suspend Lapia, and failing to prevent Lapia from visiting the Greensburg headquarters. The PSP moved for summary judgment, arguing plaintiff's hostile work environment claim is time-barred by the statute of limitations.

"Under Title VII, a plaintiff must file his [or her] complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if he initially instituted proceedings with a state or local agency such as the PHRC." [3] Kunwar v. Simco, 135 F. Supp. 2d 649, 655 (E.D. Pa. 2001) (citing 42 U.S.C. § 2000e-5(e)). To bring suit under the PHRA for a hostile work environment claim, a plaintiff must first file an administrative

---

[3] No alleged act of sexual harassment occurred within either the 300-day or 180-day filing requirement.

complaint with the PHRC within 180 days after the alleged act of discrimination. 43 PA. CONS. STAT. § 959(a), (h). If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997), cert. denied, 522 U.S. 914 (1997). Pennsylvania courts have strictly interpreted this time requirement, and have repeatedly held that "persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act." Woodson, 109 F.3d at 925 (citing Vincent v. Fuller Co., 616 A.2d 969, 974 (Pa. 1992)).

The alleged sexual harassment occurred between June 2002 and October 9, 2002, the last day plaintiff had contact with Lapia. Plaintiff filed her complaint with the PHRC on September 23, 2004 – 716 days after the last contact. The record indicates plaintiff dual-filed her complaint with the EEOC, as the September 23, 2004 complaint contains an EEOC case number (EEOC No. 17FA560831) (Defs.' Mot. to Dismiss Second Am. Compl. (Docket No. 56), Ex. A.) For plaintiff's claims to be timely, a discriminatory act must have occurred 180 days prior to her dual-filing, or between March 28, 2004 and September 23, 2004. The PSP asserts there are no facts establishing Lapia committed an act of sexual harassment after October 9, 2002, rendering plaintiff's claims time-barred.

Plaintiff does not allege an unlawful act of sexual harassment occurred during the filing period; rather, she asserts the continuing violation doctrine applies to her Title VII and PHRA claims because the PSP delayed the investigation into Lapia's behavior and allowed Lapia to remain employed, which forced plaintiff to avoid Lapia when he visited the Greensburg headquarters. Plaintiff argues Lapia's retirement on April 27, 2004 was the final act in her

hostile work environment claim, rendering timely her September 23, 2004 PHRA and EEOC filings.

### a. Continuing violation doctrine

The Court of Appeals for the Third Circuit has applied the continuing violation doctrine as an equitable exception to the timely filing requirement. Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001); West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995). District courts likewise have applied the doctrine to claims under the PHRA. See generally Cortes v. R.I. Enterprises, Inc., 95 F. Supp. 2d 255, 263 (M.D. Pa. 2000). Courts frequently construe the doctrine as a "narrow exception" to the timely filing requirement. See Voices for Independence v. Pa. Dep't of Transp., No. 06-78, 2007 WL 2905887, at *8 (W.D. Pa. Sept. 28, 2007) (citing MFS, Inc. v. Twp. of S. Anville, No. 05-1371, 2006 WL 3254535, at *3 (M.D. Pa. Nov. 9, 2006)).

The Supreme Court has held that a claim alleging a hostile work environment will not be time-barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002) (plurality opinion). To demonstrate the continuing violation doctrine applies to a hostile work environment claim, the plaintiff must first show that at least one discriminatory act occurred within the filing period. West, 45 F.3d at 754. "The crucial question is whether any *present* violation exists." Id. (citing United Airlines, Inc. v. Evans, 431 U.S. 553, 558 (1977); see Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997). The plaintiff must also establish the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination. West, 45 F.3d at 755. The relevant

distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent on-going pattern. Id.

The rationale set forth in Berry v. Board of Supervisors of Louisiana State University, 715 F.2d 971 (5th Cir. 1983), is a helpful guide for a district court to use in determining whether a plaintiff has established a continuing violation. See, e.g., Rush, 113 F.3d at 481. The court of appeals in Berry enumerated three factors that should be considered:

> (1) subject matter--whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency--whether the acts are recurring or are more in the nature of isolated incidents; and (3) degree of permanence--whether the act had a degree of permanence which should trigger the plaintiff's awareness of and [sic] duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292 (citing Berry, 715 F.2d at 981). The consideration of "degree of permanence" is the most important of the factors. Berry, 715 F.2d at 981.

Turning to the first Berry factor, plaintiff did not demonstrate the subject matter of the alleged discrimination she experienced outside and during the limitations period was of the same type. The record indicates Lapia sexually harassed plaintiff from June 2002 to no later than October 9, 2002. The alleged acts include Lapia kissing plaintiff, telling plaintiff he would "French kiss" her, verbally counting down the days until he became plaintiff's supervisor, putting his arm around plaintiff's waist and simulating biting her breast, grabbing her buttocks, and putting his hands on her shoulders. The parties agree that Lapia did not commit an act of sexual harassment against plaintiff after his transfer to the Indiana station on October 15, 2002. The only incidents that occurred after Lapia's transfer are the following: (1) the PSP purposefully delayed the investigation into Lapia's behavior, (2) the delay allowed Lapia to remain employed by the PSP long enough to retire with twenty years of service and receive

increased retirement benefits, and (3) while remaining employed by the PSP, Lapia was permitted to visit the Greensburg headquarters, which forced plaintiff to take affirmative steps to avoid Lapia during those visits.

Taking into consideration all the evidence presented by plaintiff, and construing all reasonable inferences in her favor, a reasonable jury could not find that any alleged act taken by the PSP during the limitations period constituted discrimination of the same type as that occurring prior to the filing period. Berry requires the discrimination outside and within the statutory period be the same type. Berry, 715 F.2d at 981. Here, the acts outside the statutory period are acts of sexual harassment. The record does not support, nor does plaintiff argue, that the acts inside the statutory period could be construed as gender-based discrimination. See Clegg v. Falcon Plastics Inc., 174 F. App'x 18, 25 (3d Cir. 2006) ("Facially neutral acts can form the basis of a hostile work environment claim, as long as they are motivated by gender-based discrimination.").[4] The conduct following Lapia's transfer and transpiring inside the statutory period concern the PSP's investigation process, the benefits Lapia might have received as a result of the delay, and steps plaintiff took to avoid Lapia after his transfer and until his retirement.

Taken together, these acts do not constitute the same type of discrimination that took place outside the limitations period. None of these acts were sexual in nature. See Sicalides v. Pathmark Stores, Inc., No. 99-3465, 2000 WL 760439, at *5 (E.D. Pa. June 12, 2000) (continuing violation does not apply when incidents outside the time period all involved sexual touching, but the incident during the time period involved an ambiguous comment accompanied

---

[4] The PSP's conduct about which plaintiff complains is more closely related to a claim of retaliation – not hostile work environment based upon sexual harassment. See Clegg, 174 F. App'x at 25 ("'Title VII may impose liability on an employer for the creation or toleration of a hostile work environment motivated purely by the plaintiff's filing of a complaint of sexual harassment, [but] this is a form of retaliation rather than sexual harassment, and it must be argued as such.'") (citing Berry v. Delta Airlines, 260 F.3d 803, 809 (7th Cir. 2001)).

by a nonsexual nudge). There are no acts constituting plaintiff's claim for hostile work environment *based upon sexual harassment* that fall within the relevant time period.

Even if the court were to hold the continuing violation doctrine applied, it is likely that none of the acts committed by the PSP after Lapia's transfer qualify as discrimination that would support a claim for hostile work environment based upon sexual harassment. First, the factual premise for plaintiff's allegation that the PSP was not diligent in its investigation is not discriminatory in nature and is not supported by the record. The evidence demonstrates the PSP took immediate action to transfer Lapia and commenced an investigation once plaintiff filed her internal complaint. The PSP conducted an investigation during which several individuals connected to the allegations were interviewed, the findings were forwarded to the Westmoreland County District Attorney, conclusions regarding Lapia's conduct favorable to plaintiff were reached, and appropriate punishment (including a court-martial) was recommended. (See generally Defs.' App., Ex. 18.) Plaintiff's disappointment in the length of time the PSP took to investigate the complaint does not render the investigation an act of discrimination. See Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997) ("[T]he law does not require that investigations into sexual harassment complaints be perfect.").

Second, plaintiff's argument that the investigation's delay allowed Lapia to retire with increased retirement benefits would not be sufficient for a jury to find that the PSP engaged in discrimination, gender based or otherwise. Plaintiffs are not permitted to dictate the form of punishment or treatment of an alleged harasser after a complaint has been filed. Knabe, 114 F.3d at 414 (holding "an employee cannot dictate that the employer select a certain remedial action" as long as the remedial action is "'reasonably likely to prevent the offending conduct from reoccurring'") (citing Ryczek v. Guest Servs. Inc., 877 F. Supp. 754, 760 (D.D.C. 1995)).

Third, while plaintiff alleges Lapia was permitted to visit the Greensburg headquarters numerous times and that she had to take affirmative action to avoid him, there is no evidence that any act of sexual harassment occurred. The remedial action taken by the PSP, i.e., Lapia's transfer to the Indiana station, effectively ended the harassment. See Adreoli v. Gates, 482 F.3d 641, 644 n.2 (3d Cir. 2007) ("A remedial action that stops the harassment is adequate as a matter of law."). Tellingly, at no time between Lapia's transfer and his retirement did Lapia see, speak to, or attempt to contact plaintiff. While plaintiff saw Lapia across a parking lot at the Greensburg headquarters, and took steps to avoid Lapia when he visited the headquarters for routine assignments, no jury could find that the need for those actions by plaintiff rises to the level of sexual harassment. Compare Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d Cir. 1997) (rejecting the plaintiff's argument that requiring her to work in close proximity to her alleged harassers constituted sexual harassment *per se*), with Adreoli, 482 F.3d at 646 (genuine issue of material fact existed as to whether prompt remedial action was taken by employer after the plaintiff complained of sexual harassment when her co-worker, among other things, continued to make verbal and physical threats against the plaintiff in the employers' parking area after he was transferred to a different shift). Plaintiff failed to satisfy the first Berry factor and is unable to demonstrate a continuing violation.

Even assuming plaintiff satisfied the first factor, she did not satisfy the other two Berry factors. There is no indication that the alleged discriminatory acts can satisfy the frequency requirement. It should be noted that the courts do not set a specific standard for determining how close together the acts must occur to amount to a continuing violation. Cowell, 263 F.3d at 295. The kind of acts that would satisfy the "frequency" factor of the Berry inquiry, however, must at

least be acts of substantially similar nature to those which were the basis of the original claim. Id.

Based upon the record, it is not clear to the court how frequently Lapia visited the Greensburg headquarters between October 15, 2002 and April 27, 2004. Plaintiff alleges, without further explanation, that Lapia frequently and repeatedly visited the Greensburg headquarters. Plaintiff notes that she rescheduled her attendance at three training sessions due to Lapia's anticipated presence at the sessions. Plaintiff asserts the PSP delayed its investigation into Lapia's behavior from the date plaintiff filed her internal complaint on October 9, 2002 until Lapia's retirement on April 27, 2004. Taken collectively, it is possible that the combination of events during the relevant time period could be considered sufficiently frequent. Compare West, 45 F.3d at 755-56 (continuing violation found where incidents occurred consistently with increased frequency over time and without respite); with Sicalides, No. 99-3465, 2000 WL 760439, at *6 (three-month hiatus between incidents prevented plaintiff from establishing requisite frequency). Having found, however, that these events are not substantially similar in nature to those which formed the basis of the original claim (i.e., sexual harassment), the court holds that no jury could find plaintiff satisfied the second Berry factor.

The evidence of record shows the acts of sexual harassment outside the statutory period had a degree of permanence, such that plaintiff was aware of a duty to assert her rights. Plaintiff filed her internal complaint against Lapia with the PSP on October 9, 2002. The internal complaint listed specific instances of sexual harassment committed by Lapia between June and October 2002. (Defs.' App., Ex. 17 at 1-2.) Plaintiff's knowledge of the wrongfulness of the sexual harassment, coupled with Lapia's transfer and removal as plaintiff's supervisor, demonstrates plaintiff was on notice to assert her rights against the PSP before September 2004, and her claim

accrued no later than October 9, 2002. See Voices for Independence (VFI) v. Pennsylvania Dept. of Transp., No. 06-78, 2007 WL 2905887, at *10 ("if prior events should have alerted a reasonable person to act at that time the continuing violation theory will not overcome the relevant statute of limitations"); Cowell, 263 F.3d at 295 (plaintiffs were aware of the wrongfulness of the liens when the liens were imposed in 1992 and 1993, and should have brought a claim to strike the liens within the applicable limitations period).

Viewing all evidence in the light most favorable to plaintiff, no reasonable jury could find that the three Berry factors were satisfied and under those circumstances, the continuing violation doctrine does not apply in this case. Summary judgment must be granted in the PSP's favor with respect to plaintiff's claims for hostile work environment under Title VII and the PHRA.

## B. Count II - § 1983 claim

Plaintiff asserts under § 1983 that the individual defendants violated her Fourteenth Amendment right to equal protection. The individual defendants moved for summary judgment with respect to plaintiff's § 1983 claim, arguing the claim is time-barred by Pennsylvania's statute of limitations.

Section 1983 establishes a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights. Burella v. City of Phila., 501 F.3d 134, 139 (3d Cir. 2007). Section 1983 "creates no substantive right; it merely provides remedies for deprivation of rights established elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the

> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. The Fourteenth Amendment to the United States Constitution provides, in

pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection

of the laws." U.S. CONST. amend. XIV, § 1.

### a. Statute of limitations

The limitations period for a § 1983 claim is governed by the personal injury tort law of

the state where the claim arose. Wallace v. Kato, 549 U.S. 384, 387 (2007). The statute of

limitations in Pennsylvania for a § 1983 claim is two years. 42 PA. CONS. STAT. § 5524(2); see

Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009). "Federal law governs a cause of action's

accrual date." Kach, 589 F.3d at 634. Under federal law, a claim accrues, and the statute of

limitations begins to run 'when the plaintiff knew or should have known of the injury upon

which its action is based.'" Id. (citing Sameric Corp. v. City of Phila., 142 F.3d 582, 599 (3d

Cir. 1998)).

An objective approach is used to determine when the claim accrues; it is not a matter of

"what the plaintiff actually knew but what a reasonable person should have known." Kach, 589

F.3d at 634. Even if the full extent of the injury is unknown or beyond prediction, the claim

accrues and the statute begins to run; otherwise, "'the statute would begin to run only after a

plaintiff became satisfied that he [or she] had been harmed enough, placing the supposed statute

of repose in the sole hands of the party seeking relief.'" Id. at 635. (citing Wallace, 549 U.S. at

391).

Plaintiff commenced this suit by filing her complaint on September 5, 2006.  Under Pennsylvania's two-year statute of limitations, a claim based upon conduct that took place before September 5, 2004 would be time-barred.  Defendants moved for summary judgment asserting plaintiff's claim is time-barred because Lapia's retirement on April 27, 2004 was the last day any unconstitutional act could have occurred.

Plaintiff asserts that, pursuant to the federal discovery rule, her claim against the individual defendants did not accrue until 2009.  Plaintiff argues she discovered her injury on the dates the individual defendants were deposed in February and April 2009.  Plaintiff asserts she could not have known of her injury until the individual defendants indicated during deposition testimony that they could have restricted Lapia's movement or suspended him during the PSP's internal investigation.

### b.  Discovery rule

The Court of Appeals for the Third Circuit has recognized that in a federal question case, absent any contrary directive from Congress, courts should "employ the federal 'discovery rule' to determine when the federal claim accrues for limitations purposes."  Romero v. Allstate Corp., 404 F.3d 212, 222 (3d Cir. 2005).  The federal discovery rule provides that a claim will accrue "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  Id.

Plaintiff argues the individual defendants failed to prevent Lapia from visiting the Greensburg headquarters (i.e., failed to restrict his movement or issue a suspension), thereby forcing her to take affirmative steps to reschedule training sessions and avoid Lapia's presence which violated her right to equal protection under the Fourteenth Amendment.

Plaintiff did not demonstrate in her complaint or any submissions how the alleged injuries violate her right to equal protection.[5] Plaintiff does not point to evidence of purposeful discrimination by the individual defendants, and does not identify other similarly situated individuals who were differently treated. See Bierley v. Grolumond, 174 F. App'x 673, 676 (3d Cir. 2006) ("To bring a successful equal protection claim under § 1983, a plaintiff must prove the existence of purposeful discrimination, and demonstrate that he [or she] was treated differently from individuals similarly situated.").

Assuming plaintiff adduced sufficient facts to support a plausible § 1983 claim, the court will consider whether plaintiff's § 1983 equal protection claim occurred during the two-year period prior to the date her complaint was filed. The record reflects that plaintiff knew Lapia's visits to the Greensburg headquarters formed the basis of her alleged injury in September, October, and November 2003, when she was forced to reschedule three training sessions. Plaintiff was on notice that Lapia was permitted to visit the Greensburg headquarters between October 16, 2002 and April 27, 2004, as she asserts Lapia "regularly and frequently" made trips to headquarters, and that "on many occasions . . . [she] was unexpectedly subjected to Lapia . . . and was forced to take evasive steps to protect herself . . . ." (Pl.'s Second Am. Compl. (Docket No. 55) ¶¶ 26, 28.)

Plaintiff stated in her deposition she knew about her alleged injury in January 2004, and that the injury was caused by the individual defendants:

> A. I was told in January of 2004 that they were going to let
> Sergeant Lapia retire, which indicated to me that he wasn't going
> to receive any form of discipline. That would have been the last
> week of January 2004. Because the very next week, on February,
> the first week of February of 2004, I contacted Calvin Andrews
> three times that week, and he never returned my call to this day.

---

[5] The injuries about which plaintiff complains in her § 1983 claim likely would not qualify as acts of discrimination. See supra pp. 17-18.

Q. Who told you that Lapia would be allowed to retire?

A. Lieutenant Weaver was informed of that.

Q. Lieutenant Weaver is the person that told you?

A. Correct.

Q. Do you know who told Lieutenant Weaver?

A. Our disciplinary officer, who was Captain Titler.

(Defs.' App. (Docket No. 64), Ex. 30 at 157.)

Plaintiff admitted in her first amended complaint that she "did not learn of all these actions until April 28, 2004" (referencing the individual defendants' failure to prevent Lapia from visiting the Greensburg headquarters, failure to suspend Lapia, delay of the investigation, etc.). Taking plaintiff at her word, the latest date she had knowledge of her injury – and therefore the latest accrual date – was April 28, 2004, which is more than two years prior to the date her complaint was filed.

Plaintiff argues that she became aware of the individual defendants' involvement in her injury and their capacity to prevent the injury in 2009. The additional knowledge acquired from deposition testimony, however, does not permit plaintiff to invoke the discovery rule. Plaintiff's knowledge about Lapia's visits which formed the basis of her claim was acquired in 2003 and 2004. While plaintiff may not have understood the exact parameters of the injury and involvement of the individual defendants until 2009 (long after she filed her PHRA and EEOC complaints) those facts would not enable a jury to conclude the discovery rule applies in this case. See Wallace, 549 U.S. at 391 ("The cause of action accrues even though the full extent of the injury is not then known or predictable."); see generally Bradley v. Conner, No. 07-1347, 2007 WL 4241846, at *4 (W.D. Pa. Nov. 29, 2007) ("State and federal courts in Pennsylvania,

applying Pennsylvania law, have expressly rejected application of the discovery rule where a plaintiff merely lacks knowledge as to the defendant's identity.").

The court holds plaintiff did not adduce sufficient evidence to raise a genuine issue of material fact with respect to whether the discovery rule applies. Plaintiff filed her claims with this court on September 5, 2006. Only claims that arose after September 5, 2004 would be timely. Plaintiff did not present any evidence of an equal protection violation that occurred during the statutory period. The motion for summary judgment must be granted in favor of the individual defendants with respect to plaintiff's § 1983 claims.


### *Conclusion*

Viewing all evidence in the light most favorable to plaintiff, the court concludes with respect to plaintiff's Title VII and PHRA hostile work environment claims that the last alleged act of sexual harassment occurred more than 180 days prior to the filing date of plaintiff's EEOC and PHRC charges. Additionally, because no reasonable jury could find that the three <u>Berry</u> factors were satisfied, the continuing violation doctrine would not apply. Plaintiff's Title VII and PHRA hostile work environment claims are time-barred and summary judgment must be granted in the PSP's favor with respect to those claims.

After viewing the facts in the light most favorable to plaintiff, the court concludes with respect to plaintiff's § 1983 equal protection claims that the last alleged act of discrimination occurred more than two years prior to the filing date of plaintiff's complaint with this court. Additionally, because no reasonable jury could find that the federal discovery rule applies, plaintiff's § 1983 equal protection claims are time-barred and summary judgment must be granted in favor of individual defendants with respect to those claims.

By the court,


/s/  JOY FLOWERS CONTI
Joy Flowers Conti
U.S. District Judge

Dated: September 2, 2010